Case No. 15-1010 et al., CARE One at Madison Avenue, LLC, Doing Business as a CARE One at Madison Avenue Petitioner v. National Labor Relations Board Ms. Murphy for the Petitioner, Ms. Rajapowski for the Respondent, and Ms. Hanson for Intervener for Respondent Good morning. Good morning, Your Honor, and may it please the Court. Erin Murphy on behalf of Petitioner CARE One at Madison Avenue. This case is a classic illustration of how the Board's ever-changing precedents leave employers in an untenable position during a union election campaign. The Board repeatedly found here that Petitioner violated the law by doing things that the Board's own cases expressly tell employers that they may do, and indeed, in some circumstances, even encourage employers to do. Those findings cannot be reconciled with basic principles of reasoned decision-making, and they find no support in the scant evidence on which the Board chose to rest its case here. If I could start by talking about the benefits issue. Under the Supreme Court's decision in exchange parts, and the decisions of this and other courts interpreting it, the basic question in any case involving the granting or withholding of benefits during a union election is whether the employer acted with the intent to impact the election. Have we held that in the case in this circuit? Yes, that's what the Court said in the Pedro's case, one of the first cases where the Court dealt with this issue. And in the cases since then, the Court has always looked at them and determined whether there was evidence in the record to substantiate a motive finding. So the Court... It is true, is it not, that the Board has, for the last 50 years, identified certain conduct that it views to be necessarily prejudicial in these circumstances. Your brief acknowledges that. Well, the Board has tried to, but in many of those instances, courts have refused to enforce its orders. That's a different question, isn't it? You're before this Court. Sure, but I think it's fair to employers that when they're looking at Board decisions, and then a Court reviews them and says, no, you can't proceed that way because it's inconsistent with the Act, that it is fair for an employer to look at decisions that are telling the Board, stop applying per se or presumptive rules in these circumstances. So is that what you tell your corporate clients, too, that it doesn't matter what circuit you're in? No, the problem here is that the Board doesn't have a clear rule that tells people, it tells employers what they can and can't do. Because at the same time that it is sometimes said that it's a per se violation, say, for instance, to grant to some employees while withholding from others, there are cases where it's said it's not. And I would point you, for instance, to the Noah's New York Bagels case. That's a case where some employees got benefits and some didn't. But in that case, I thought it turned on whether or not the employer had a business justification. And there are categories of conduct where the Board has closed off that as a potential defense. That's actually not. In the Noah's New York Bagels case, the only thing that was said was the employer, in a circumstance where it was granting a new benefit, which is what was going on here, the Board said it was the right thing to do to not grant that benefit as to voting employees. And the Board's words were, that's the prudent thing to do and the thing that is less likely to result in an unfair labor practice, because we won't presume that you did something wrong if what you're doing is preserving the status quo, not granting a new discretionary benefit. So this is where the employees had a benefit, the employer reduced them, the employees objected, and then the employer decided it was going to restore some. Is that not correct? That's right. But the reduction occurred before the union ever came on the scene. So there's no allegation here that the reduction had anything to do with the election? I'm not suggesting that. I'm just talking about the experience of the employees. Sure. Or your client. Sure. They had a benefit, it was reduced, they complained, and the employer decided to restore part of it. That's right. But what the employer was doing was making a unilateral discretionary change. This isn't a case where, say, you know— I'm not suggesting that. I'm just suggesting I'm working for the company and here's my experience. I had a benefit, it was reduced, now the employer is going to give some of it back to me. Isn't that the fact here? Yes. That is what was going on here. And what's the business reason for the timing and for the decision to withhold it from some and give it to others? The business reason is because the board has told employers that if they go ahead with an increase during an election, it will be treated as presumptively unlawful. So the board can't say it's presumptively unlawful, but then turn around and say it's per se unlawful if you don't go ahead with the increase. It's presumptively unlawful in certain circumstances, absent a business reason. And my question was about the business reason for the timing and for the decision to grant. The decision to grant? The stipulated record is that the reason that they granted was in response to the employee complaints. And the timing? And there's nothing—I mean, there was no evidence that the board put on one way or another about the reason for the timing of it. It was all within—you know, it was a January 1st decision to decrease the benefits and then it was about two months, three months later when the decision was made. You say there's no evidence the board put on, but wasn't that the employer's burden to put on evidence? It's not. I mean, it's ultimately here we didn't grant the benefits. And the presumption should be applying, as courts have said, when you are either granting benefits or changing the status quo. And we weren't doing either of those things. The benefits weren't granted and there wasn't a change in the status quo because they would have been new benefits, not something that was, you know, done every year on the same date. So under those circumstances, courts have repeatedly told the board, you have to put substantial evidence in the record that demonstrates that the employer acted with improper motive. You can't just assume that everything the employer does is motivated by intent to influence the election. What about the stipulation here where the employer told the board why it didn't provide this increase to eligible voting employees? Well, the stipulation is simply that they didn't provide the increase because an election was pending. That doesn't say anything about motivation. Because that is perfectly consistent with trying to comply with the law. When the board is saying, don't go ahead with a discretionary benefits increase while an election is going on. Well, let me just ask you, you know what the board counsel is going to say. It's in the brief. The board's position is it's been very clear, despite your brief, that the board says the employer has several options. But the relevant option here is you tell your employees that you don't want to be viewed as trying to influence the election. But the employee should be certain that once the election matter is resolved, their benefits will be restored the same way the benefits have been restored for the other employees. Sure. Now, why is that Janice-like? Why is that unclear? The board's been saying it for decades. Well, for one thing, I mean, I think there's a big problem with the fact that courts have repeatedly refused to enforce the very orders the board is relying on here. But even setting that aside. In this circuit on that issue? On that particular issue, this circuit hasn't dealt with the case dealing with the safe harbor. The Third Circuit did just this past year say the board can't treat that safe harbor as a sword rather than a shield. And it was on identical backers. I'm just wondering in this case in the Third Circuit, given that precedent. Well, that precedent didn't exist yet when we brought this case. But, you know, I think that there's no great reason to depart from the reasoning that the Third Circuit applied there. I mean, what the Third Circuit said there was not the board can never find a violation on these facts. It just said you have to prove motive. But even under the Noah's New York Bagels case, it seemed that there the board was very careful to talk about the timing of when the decision was made by the employer. And they said that if the timing of the decision was before the employer knew that there was going to be a union election, then presumptively you should just go ahead and give the benefit to everyone, including the union employees. But if the employer makes the decision after it knows about the election, the presumption should be to withhold the benefit, as you did here. But it also says, as we said in Purdue Farms and as the board has said umpteen times, if you want to withhold, then explain why you're withholding. Why didn't you explain here? So there's several problems, I think, with this safe harbor. I mean, for one thing, it forces employers to give a promise that they may not be able to keep. Because if the union wins the election, they have an obligation to bargain with the union at that point. They can't unilaterally change benefits. You can mean people can explain, you know, the exceptions, you know, when you're explaining. You can say, if we'll give you the benefit after the election, but if the election's contested, we have to wait until after those contests are over. Or if the union elect is successful, then we'll bargain with the union and we'll deal with it then. I mean, you can explain all of those things. Sure, and I think all of that becomes quite problematic for an employer in the context of when they are exercising their rights to try to discourage voting for the union, they have to tell employees that as to all other benefits, they're not allowed to talk about them and they're not allowed to change them. And then to tell them that even though they've told their employees, we're not allowed to do anything about your benefits, they should turn around and say, oh, except for this one benefit that we're telling you right now, we're going to grant you retroactive to today as soon as this election is over. It's putting employers in a really, really difficult position. It doesn't put them in any difficult position if they just issue a statement that says, we've given this to every other single employee in the company. You're not going to be discriminated against because you are voting for the union. You'll get it, too, as long as, you know, we can legally give it to you after this election is over. What's so complicated about that? Because it does put employers in a position of basically saying, this looks like we're bribing you, but don't worry, we aren't. And employers are trying to show... The board has said that you can do it, and if that's what it says in its cases, you may think that that's confusing or sending mixed messages. But what's important is, are you going to be held to account by the board afterwards? Well, I think part of it is, has the board said you can do it or has the board said you must do it and that's the only way you'll comply with the law? And I don't think they've said the latter. And the other thing that I think is quite important here is, even before this court, in their brief, they go out of their way to say that even if you comply with the safe harbor, you may still be held to have violated the law. And they cite a case in their own brief where they hold that an employer, even though it complied with the safe harbor, still violated the law because they decided that there was other evidence there that suggested that even what they were doing and even compliance with the safe harbor didn't overcome a presumption of impermissible motives. So when you have a safe harbor that the board itself says is not even really safe, I don't think employers are really left with an option where they can act and know that what they're doing is consistent with the law. What case supports you saying nothing, as you did here? The Noah's New York Bagels case. That's a case where the employer said nothing. They granted to one, to the group that was not voting. They didn't grant to the other group. There's no discussion anywhere in the opinion of anything about a safe harbor, and the board said that was the right thing to do, the more prudent thing to do, the thing that was least likely to result in an unfair labor practice charge. That's a decision from the board telling employers this is okay. So even if they have in other cases said it's also okay if you have the safe harbor, at that point I don't think they can tell employers if you don't use this safe harbor that's not even 100% safe, you will be held to have per se violated the law. Just so that we're clear here, does the board have a procedure akin to SEC where you can get a no action letter from the SEC? Does the board have any procedure there where you can seek guidance ahead of time or kind of as this is unfolding? I don't know the answer to that question. I thought that's what Washington lawyers did. I think some of this has to be put in the context, though. You have here a record where if you look at the record of the objections, the union objected to anything that happened during the election period that looked even remotely like granting a benefit. They objected to a new ice machine being put in. So the idea that there wasn't going to be an objection if we'd gone ahead with it, if we'd complied with the safe harbor, there was still going to be an objection, and we would have, no matter what we did, been taking that risk. Why isn't there anything in the record, though, about why nothing was expressed, why no statement at all or explanation was given to the employees? Well, again, in our view, it is the board's obligation, and this court said in Pedro's that it's the board's obligation to put in evidence and substantiate its burden of proving improper motive. And when they haven't put in anything, wait, I thought in Pedro's the employer had met its burden of pointing out a reason for the timing of the new benefit. They had found an insurance broker, and it has nothing to do with the pending election. And so that was an employer burden, and that's what I'm curious about here. You haven't proffered any reason for the timing of this benefit change. And as I understand it under Gray-Dane, there's not a need to show motive if there's a formal distinction between the treatment of voting-eligible, union-eligible employees and others. That is a facial distinction. And that is the distinction that has been rejected by five courts in a row, going back to the Second Circuit in J.J. Newbery, the Marshall-Durbin case from the Fifth Circuit, the Sixth Circuit in Bowling Green, the Seventh Circuit in Kerwood, and the Third Circuit just last year. They all said you can't apply a presumption. They said basically as long as it is presumptively unlawful to grant benefits, you can't also apply a presumption that it's unlawful not to grant benefits. So you can't put the burden on the employer in every case. But this is a Gray-Dane situation. This is a Gray-Dane situation where there's a distinction between the treatment given to employees All five of those were cases with a distinction. That's precisely what the issue was. In each of those cases, the board said we don't have to prove our burden because there was a distinction between voting and non-voting employees. And in that particular circumstance, every one of those courts said no. Even there, when you're having a differentiation between voting and non-voting employees, you still have to make your case. And the reason they said that is because in this particular area, we're operating against a backdrop where both granting and withholding could violate the law. And if you're in an area where anything you do could violate the law, it can't be our obligation to prove that we didn't violate. I think we're acting against a backdrop in which the Supreme Court and the board have said employers have to act the way they would act even if there were no prospect of union elections. And if they do take some action, they have to have a reason that's unrelated to union activity or suppressing union activity. And I don't see that. I mean, the Supreme Court certainly never adopted this rule of ignore the union. What they said is what's impermissible is acting with intent to impact the election. Well, and in Great Dane, they said, I mean, it's like facial or motivated in there. They said if it's a facial distinction, that's enough. And again, I mean, I think there's a reason that every court that's considered that issue, there's not a court that's accepted the board's position on that. You keep saying that, and yet every time we talk about these cases, including the Doa's case, you know, in that case, there was a business justification that was given here. All right, you don't think it's a business justification, but the board thought it was about the insurance, et cetera. The Third Circuit didn't say, no, you can't ever do this. I think, you know, in fairness, you're over-reading what some of the circuits have done, and we haven't yet spoken. But I just want to be clear here. The ALJ, in dealing with your case and what your client did, spelled out very clearly the distinction with Noah Bay Area Bagels, all right, and had discussed the inherent danger concept that the Supreme Court acknowledged in exchange parts, and then talked about what the board's precedents squarely said. And here we have stipulated facts as to why the employer didn't do this. We have this timing question. We have what I have described as a factual situation of the employees had a benefit. It was reduced and it was restored in part to some employees who were not eligible to vote in the union election. And in that, your client chose to stipulate the facts and not to address some of these questions. In that circumstance, I'm not clear why we would say that the board either acted impermissibly in finding a violation or failed to adhere to its own precedent. Well, I think that, I mean, right from the start in this case, we have been making the argument that even if that's what the board's precedent has said, it's not permissible. It's not consistent with the act. Because the board is not authorized under the National Labor Relations Act to come up with rules for conduct when the sensitive management relations questions are being raised? What the board is not allowed to do is come up with arbitrary or irrational rules. But that's the conclusion, counsel, and that's what we're trying to get at, as to why is this irrational in the sense that it's a difficult situation. Everybody understands that from management's point of view, from the employee's point of view. And so the board, which Congress has identified as the expert here, has come up with a solution. It may not be the best solution. It may not be one that the employees like. It may not be one that management likes. But the board says we balance these interests, and here's what we think is the best way to proceed. And I just want to understand how we get in the midst of that, mix of that, and second-guess the board. I don't mean to frustrate you by referring to other cases again, but this isn't something out of the ordinary that we're asking here. Okay, so what should the board have done that it didn't do? It should have put on evidence of motive. It should have. The board should have put on- Absolutely. But the board has identified, citing the Supreme Court decision, that there are certain types of conduct, all right, where the danger is inherent. That's the Supreme Court language. But the Supreme Court wasn't referring to this conduct. No, but it was talking about where the employer took action for the purpose of influencing the outcome of the election. That's right, and this conduct does not inherently amount to taking action for the purpose of influencing the election. The exchange price couldn't have been clearer that it was a motivation case. Well, I'm just not clear, Ms. Murphy, why the timing. The employer had decided, we're going to give these benefits retroactive to January, and we're going to give them to all the employees. They've been thinking about that for some months. They learned that there's an election scheduled for March 23rd. And lo and behold, they give the benefits to the non-bargaining unit eligible employees, what is it, 10 days, 2 weeks before the election, and not to the others. And they post things where all the employees can see that there's been an increase in benefits, and the union eligible employees know they haven't received it. No explanation, no explanation whatsoever. Why isn't that just an 883 violation under Great Dane? Well, I think what's interesting about the question you just asked is it underscores why the argument that the board's making here really can't be right, because what they say is what we should have done is granted the benefits to everyone, because that would have been so clearly permissible. And as you were suggesting... I think the first line would be, why not wait another 10 days? The first line is, why not wait until after? But the reason here, I think, is that you have to put it in the broader context. There's 20 facilities here. The majority of them don't have any union activity going on, so you would have been asking them... So wouldn't it be easy to have explained the timing? That's what I'm saying. It would have been easy to say, well, we needed to do it at this time, because blah, blah, blah, blah, operational criteria. Look at our opinion in PENDRO's. It's just not that hard to come up with a legitimate reason, a business reason, for the timing. But we don't have anything to work with in the record. And you've been given a reason for the timing. I mean, if you take a look at the board's brief on pages 38 and 39, they say it's irrelevant what our motive was. They say it doesn't matter what we would have put on about timing, about any of it. It's irrelevant what our motive was, so long as we were granting to some and withholding from others, we automatically violated the law. And I don't think that can be right in a context where courts have said we can't. I think the Supreme Court says you automatically have a burden, then. And my question is, how did you meet that burden? Again, our position is that as long as the court is also saying that we have a burden if we had gone ahead and granted, we can't always have the burden. It's the board's ultimate burden. And it can't be that no matter what we did, we had to come in and prove that it was lawful. And they're saying there's not a single thing we could have done in which we wouldn't have had the burden to come forward and prove that what we were doing was permissible. If we granted, we would have had to explain, too. In this context. Let's hear from the board, and we'll give you some time later. Thank you. May it please the court. My name is Neelakshmi Rajapaksa. I'm counsel for the National Labor Relations Board. Well, you've heard the argument. You've read the briefs. It's all very confusing. The employer was trying to do its best, and now the board has come and found violations. Right. We obviously disagree, as we've said in the brief, about the confusing, allegedly confusing situation the company found itself in. To begin, I'd just like to say that the company cites exchange parts and cases applying exchange parts. And really, what is happening in this case is the inverse of the exchange parts situation. So in exchange parts, the scenario you had is there was a grant, a targeted grant of benefits to employees in a voting unit. In this case, you have a withholding of benefits from employees in the voting unit. And so the upshot is everyone but the employees in the unit are getting a benefit. And the question is, in that scenario, what is the governing law? But why should it be any different? If the ultimate issue under either 8A1 or 8A3 is whether you're improperly trying to influence the election, why should you have to prove intent or motive whether you're buying votes or potentially coercing by withholding benefits? What's the difference? The difference, Your Honor, is in the withholding context, and particularly when you have the facts that we have in this case, where it's a company-wide benefit and only one group of employees is being singled out because of their protected activity. That, in the Board's view, is, first of all, discriminatory on its face. It is the essence and it's almost the definition of discrimination. But you said, and the Board said in Noah's New York bagels, not Noah's Bay Area bagels, but Noah's New York bagels, that if you, in New York bagels, I guess are better than the Bay Area bagels, you said that if you're going to make a decision and it's after you know about the union election, then you should withhold it. The more prudent thing is to withhold the benefits from the unit employees. Isn't that what the Board said? Well, I don't know if that statement can be attributed to the Board, to be quite honest, because I believe in that case the Board didn't adopt the portion of the decision that the company is relying on. But leaving that aside... I don't think that's right. I think that the only part that they didn't adopt had something to do with some speech that the supervisor made. I would have to look... But they adopted everything else. I would have to look back at that. But even accepting that that is the opinion of the Board, the Board has been very clear that the employer has essentially two courses of action. It cannot withhold benefits that are being given company-wide. What it can do is it can postpone and give certain assurances to the employees. And that is very clear from a very long-running line of cases that begins around the time of Great Dane, actually, with Great Atlantic and Pacific Tea, which actually issued just two weeks after Great Dane. And in that decision, which I urge Your Honors to look at, the Board said quite clearly that it considers this kind of conduct to be inherently destructive. And for that reason, there's no need to put the general counsel to proving motivation. It's apparent from the conduct on its face. And so as I believe Judges Pillard and Rogers have mentioned, the question then is really what is the business justification? And there are Board cases where the question has immediately become, okay, employer, explain yourself. And so you do have comments about that seem like motivation-type comments. But isn't the motivation here clear? I don't really understand that argument. I mean, employees weren't happy they had to pay more for their insurance, so the company decided to do something about it. That's pretty elementary. Well, the question is what was the reason for withholding? The decision about the grant of benefits, I agree with you. Or for the timing. And the timing, right. There's no explanation for the timing. But the question for the court is really, is there a business justification for this withholding? I mean, that is the Board's view based on Great Atlantic and Pacific Tea. And in this case, the stipulated record provides nothing in terms of an explanation. Is it Raja Paksha? Raja Paksha. Raja Paksha. Ms. Raja Paksha, I really have to say I have some trouble with the so-called safe harbor. And I'd like to hear from you about that. It seems to me quite as bad to say we are, you know, going to not give you benefits. Oh, we'll give them to you after the election. I mean, it just, how is that really better from the perspective of employees who need to exercise an unfettered right to choose their representatives? To be told, well, there's this, you know, other people are getting this. And when everything's smoothed out later, you'll get yours. And, you know, for some of the reasons Ms. Murphy was saying, well, maybe things will change. The power dynamic will change. There will be other issues of priority to the bargaining unit. Safe harbor seems dysfunctional, potentially, if we were looking at this on a clean slate, which I know we're not. Right. The safe harbor is really the board's way of acknowledging legitimate concerns of employers that if they, because of exchange parts, if they give benefits in the context of a pending election, they may be facing an unfair labor practice finding. And so to sort of balance the interests of employers and employees, the board, I think very fairly, has said, okay, employers, you can postpone the granting of this benefit, but just tell employees why you're doing that. The whole benefit or just the benefit for the bargaining unit employees? Just for the bargaining unit employees. And, again, it's motivated by the idea that it is acknowledged and understood that when an election is pending, the employer is facing a delicate situation where it cannot appear to be influencing employee votes. And so with that in mind, the board has said… So you're telling me if Walmart that has 4,000 stores in the U.S., but it's facing a union election of 100 employees in one store, that if they're going to implement a wage increase as to all of their million-plus employees in the U.S., they can't do it because there's an election that's about to happen of 100 employees involving 100 employees at one store? No, they certainly can. If it's a company-wide benefit, these are the two choices that the employer has. They can grant. And I know that Ms. Murphy has said… Then why did Noah's New York Bagel say the opposite, that the presumption would be that they shouldn't do it? If they're making the decision during the time of the, you know, after they know that the union election is coming up. Right, I think Noah's New York is just acknowledging that the employer may not want to do it because, again, it may be imprudent for the employer. If there's any question about the even-handedness… It didn't say that the employer may not want to do it. It said… The more prudent course. It said the more prudent course. Right, right. Granting that language is there. I think the issue is the employer has these two choices. It may be more prudent for the employer to postpone, but an employer does not have to fear in a situation like this, like we have in this case, where it's extremely clear that the benefit was a company-wide benefit. The employer only withheld it from these employees because of their involvement with the union election. In that context, an employer can just grant without fear. So in the Walmart situation, if the employer is implementing something on a company-wide basis, that is evidence that it was a neutral decision, first of all, under board cases. And so the employer can, without fear of unfair labor practice liability, just go ahead and grant the benefit. I have a question for you about the memorandum. And I'm just wondering, in the record, is there evidence that you can point us to that supports the finding that the memorandum urging the employees after the election to treat each other with dignity and respect would reasonably be interpreted to refer to disruptive pro-union activity? Yeah. So if you look at the memo, and I'm looking at the memo as reproduced in the decision in order, the first paragraph is sort of reflecting on what happened during the election and the lack of dignity and respect. I'll look at the face of the memo, because as I read the face of the memo in isolation, it does not speak one way or the other to pro-union or anti-union activity. So if you didn't know anything about the context, just reading that announcement, it says, look, we've had a divisive election. It's over. Let's let bygones be bygones. Let's treat each other with dignity and respect. And I would say that a reader might press you with the view that coming in from outer space and reading that memo, they wouldn't know which kind of trouble was being referred to there. Well, Your Honor, I'll grant— And so I wonder if you have other evidence that you're relying on. No. The memo is the—I think the Board is just looking at the text of this memo and considering, first of all, how it would reasonably be read, and second, whether it was promulgated in response to union activity. So it's not just looking at the text. It's looking at the context of the prior union activity and— Yes. Yes. —what had actually happened and what this employer stood for. Right. I mean, be careful with your position because I think it's plausible to say that on the four corners of this memo, there's nothing anti-union about it. You're right, Your Honor, in the sense that to the extent that this memo refers to a union election and prior activity, it is relevant what the surrounding circumstances were. But really, the memo speaks for itself. The memo says in the first paragraph, now that the NLRB election is behind us, and it goes on, and it refers at various points to a few employees who had differences of opinion, and it identifies those. It's very clear from this memo in the Board's view that those few employees are the union supporters. Not necessarily. There could have been very vociferous anti-union, you know, advocates, and they could have been very rude to the people who were voting for the union. And a good employer after that could say, look, don't be, you know, bad sports in your victory. Bring people together. Or don't be bad sports in your loss. You know, bring people together. So it's just not clear which way that cuts. And certainly this Court has spoken very strongly on this issue. And what is an employer supposed to do in these circumstances? I mean, it's, what, 58 to 57 and one vote challenged? And everybody acknowledges this is not a tea party. So now let's come together and work together as one family. I mean, what else? What would a good manager do? Well, I would like to answer both of those questions. The first, as to Judge Blard's questions, the paragraph that begins, while I recognize that employees have a right to make up their own minds, I think that is the paragraph where really it becomes clear that we're talking about pro-union people. Because it doesn't talk about both sides. It talks about employees have a right to be for a union. They have a right to support the union. It does talk about both sides. It does. It says they have a right. You can, you know, believe what you want. There have been some people who have been, you know, rude and violent, but it doesn't say which ones they are. Are they union goons or employer goons? It does not say. And reading it, you just aren't sure unless you have some other evidence about, oh, yeah, everyone who works there knows that the few people are, you know, Jane, Joe, and Janice. And so that's why I'm asking you about other background or context. Well, the ‑‑ I mean, I see that Your Honor is probably referring to a case like Boulder City, which is a case cited in the decision in order in which the surrounding circumstances were relevant because the memo in that case did not even expressly refer to union activity. In this case ‑‑ I grant you that it refers to union activity, but it's unclear whether it's saying now accept your brothers and sisters who supported the union or whether it's saying accept your brothers and sisters who opposed it. Well, I would go back to the idea that Section 7 protects both. So whether they're talking about vociferous pro‑union activity or anti, both of those types of activity are equally protected under the Act. Exactly. And so it doesn't really matter. It's still impinging on Section 7 activity. And I apologize for confusion. What could the employer have said? Well, the employer in a situation like this where there's been a tense election, it can ‑‑ you know, employers have to tread carefully. It can remind employees about a lawful policy. It would just be a circumstantial determination for the board in terms of whether in context what their reminder is coercive. In this case, there's no question that it ‑‑ I think that it was coercive because of the language that surrounds this reiteration of the policy. So it says we have this policy and the board finds there's no problem with the policy. All right? That's simply not at issue. Right. And so there's this memo that focuses on where we are now as a unit. And it's very difficult to see how the board finds some implication there that respect and dignity are now going to become grounds for disciplinary action where they weren't before and they will only become grounds because of some employee's activity and connection with the election. I mean, there's so many leaps there. Aren't there? Well, I don't think so, Your Honor. The board is not really pinning everything on respect and dignity. It's looking at this whole memo and saying, well, an employee who reads this will reasonably think that, first of all, there were a few employees who were persisting in, whether it's pro‑union or anti‑union activity after the election, and those few employees perhaps have done things that the company thinks are threatening. And let us just remind you what our policy is on threats. So what it's doing really is creating a link, a specific link that didn't exist before between this neutral, lawful policy and protected concerted activity. How is threats, intimidation, or harassment protected activity? Those are not—well, the board grants that an employer can bar certain kinds of extreme conduct, but then— The memo says, doesn't say, you know, let's all sing Kumbaya and not talk about union, pro or con anymore. It says let's not have any more threats, harassment, or intimidation anymore. Right, and it leaves—the problem is that it leaves— If none of those things are protected activity, then how do we make the leap then that the memo is suppressing protected activity? The problem is in large part, Your Honor, that this memo refers to employees who have been threatened, and then it builds on that idea that there have been threats that would be subject to discipline. There is no record evidence of threats other than— I mean, I think the closest is actually there is more examples of disrespectful, undignified, anti-union activity in this record than pro-union activity. One of the problems I think that the board points out is this is a memo that's issued referring to sort of thuggishness, and there wasn't any on the part of union supporters. Right, there's no evidence of any actual threats. That also means the context makes it, again, perhaps more likely that the employer is taking a deep breath and saying no more anti-union thuggishness, people. Well, the board respectfully thinks that this memo reasonably read, and again, the standard is has the board given this a reasonable— one among many possible reasonable readings. Which is why I'm asking you for more context. Right. The board's view is that this memo reasonably read conveys to employees there have been threats, unspecified threats. The employees don't know what they consist of, and so employees could think that something that is just aggressive, lawful, pro- or anti-union activity is a threat, and now it should be reported because the company has asked for employees to report such conduct. But we don't know what the underlying threats they're referring to are. And so the vagueness of this memo is really a large part of the problem. So if an employer puts out a memo that says we've been told that employees have been threatening other employees with respect to this campaign on both sides, we don't want any more threats, and here's our policy against threats, that would be improper because the memo didn't explain what kind of threats and what kind of specific threats were made. Yes, Your Honor, because when an employer is bringing in protected activity and essentially saying some subset of that activity is actually not protected and subject to discipline, it has to be specific. But what if your policy defines threats as threats of physical violence? And so if you refer to the policy and you say, you know, we don't want any threats, then how can you think that they're saying anything, referring to anything other than threats of physical violence? But this policy is broader, and it could, together with this memo, it could sweep in protected activity that is actually not threatening, harassing, or intimidating with violence. And so that, I think, is the problem, is the specific policy that you have in conjunction with these very nonspecific comments. That doesn't seem to be the rationale that the Board used in its reasoning. It seemed to rely on the fact that the employer didn't put forth any evidence that there really were any threats or that they had investigated any threats or that they had disciplined anybody for any threats. So the Board seemed to act like they thought that this memo was a sham, and for that reason it wasn't really going to give the employer the benefit of the doubt. At least that's the way I read the decision. Well, the decision at page 3 of the slip opinion, it says part of the problem is the lack of specificity and the nonspecific plea for dignity and respect. The Board also says the memorandum served as an authoritative indication to employees that the respondent would construe the policy to include protected campaigning activity and that they should do so as well. I think that's really the crux of the Board's finding, which we've been discussing. I see that my time has way expired. I thank you very much for your time. Thank you. Counsel for Intervenor? May it please the Court. I'm Katherine Hanson representing Intervenor 1199, SEIU United Healthcare Workers East. The first thing I'd like to say is that the New York Bagels case is a red herring. It does not involve system-wide benefits. The Board has for decades decided cases specifically about system-wide benefits, meaning benefits granted at more than one facility made on a corporate level, exactly the facts we have at issue here. In New York Bagels, the Board was considering a decision at one shop whether to grant benefits during the critical period. And what the Board held there was in a case where it's unclear whether the employer would be able to justify its decision to grant the benefits during the critical period. The employer is in a precarious spot, and in that case it may be more prudent to withhold the benefits from everyone because then it puts the burden on the general counsel to establish that the benefits would have been granted in the absence of the union. It is entirely different than a targeted withholding case that we have here where a decision is made corporate-wide here, 20 stores across the state of New Jersey, to grant a benefit. And that decision is withheld from employees only because they seek union representation. And what the Board has held consistently for decades with court approval is that the employer cannot lawfully withhold benefits that are granted system-wide unless they have some really good reason for it. And at the very least, it puts a burden on the employer. And Ms. Mervine correctly states that those decisions have not been enforced. Great Atlantic and Pacific Tea, the foundational case of the Board's area, was enforced by the Fifth Circuit. Great Scott of Florida, enforced by the Eleventh Circuit. Pennsylvania Gas, enforced by the Third Circuit, and on and on. In cases where you have a targeted withholding, it is a subset of cases where you have facially discriminatory conduct based only on employees' protected activities. The Board has consistently held that without more, that is unlawful. So in your reading of the Board's cases that spell out this rationale, which do you think or which are the most persuasive on that? Because one of the things about the Third Circuit case suggests is that, you know, the Board needs to provide a little more explanation. Not that it can't reach the same result necessarily, but these sort of, you know, sketchy summary statements are not enough given the different circumstances in virtually every situation. I think the other bagels case, Norwest Bay Area Bagels, goes through a detailed analysis of what the employer's choices are. That case came out three years after the other bagel case that the employer's relying on. I think Pennsylvania Gas, Associated Milk, there's one from Russell Stover. Because I'm looking at the ALJ's, you know, opinion, and it cites Norwest Bay Area. Correct. And basically that's it. And there's nothing wrong with that, but I'm just saying that we have to read, what I see is this one paragraph of four findings within that framework in order to parse out exactly what the reasoning is. Well, the ALJ's decision in this case also cites Associated Milk producers, and it also cites Great Atlantic and Pacific Tea, which is the Board's first case. What page are you on? I'm on Joint Appendix 188. Right, so am I. I see Atlantic and Pacific, but that's before the Board gets into its discussion. Well, it says it again halfway down in the second column. It, again, cites to Great Atlantic. I see that. The coercive effect of withholding and Associated Milk in the column before specifically why targeted withholding is particularly problematic. And the reason is exactly, I think as your honors have recognized, that employees are left to draw the most foreseeable conclusion, which is that they are being punished because they are seeking union representation. And all of the circuit cases that counsel for the employer cites to, first of all, don't involve targeted withholding, but involve some discussion of the employer's motive, and many cases, in fact, where the employer did explain to employees, look, this is what we're doing. The claim here that the employer withheld these benefits because the law was confusing, first of all, is simply not in the record in the burden, according to Great Dane. As this circuit has adopted in many cases, the burden is on the employer once discriminatory conduct is established to prove a legitimate business motivation. Not only is it not in the record, but the employer did not bother to tell employees why they were doing it. And what Great Dane says, and actually what the Supreme Court said many times before Great Dane, was that the natural foreseeable consequences of an act are sufficient to, that an inference should be drawn from the natural foreseeable consequences of an act. And that's exactly the foundation of Great Dane. Can I, I meant to ask your sister counsel this, and I forgot. Could I just follow up on one point on this? Go ahead. That is, what is your response to the argument that if we were to say to the eligible employees that we're just withholding this benefit temporarily, that the employer might end up violating the law? Well, I think that it is incorrect that granting the benefit after the election would be unlawful, and that is because the rules are the same before and after the critical period, whether the union wins or loses. The employer must continue to maintain the status quo, and that means that benefits that would have been granted in the absence of, you know, the election, regular benefits granted in the normal course still have to be given. So I don't think it's accurate that it puts the employer in a position where they might not be able to keep their promise. But I don't hear it's not regular in the course. It's not like an annual. It's a decision to, a one-time decision to back down from a belt tightening that they imposed in January. And so the question is, given that, how does the employer both act and show that it is acting in a way that is free of considerations about employees' protected rights? Well, what the board has said repeatedly for decades in Pennsylvania Gas, Associated, Mel Grussel, Stover's, Noah's Bagels, Network Ambulance, is that system-wide benefits are treated like benefits given in the normal course because they are made, you know, like your Walmart example is a perfect one. The board is not going to infer motive if you can show that somebody is sitting, you know, in another part of the country where you have lots of stores, made a decision to increase benefits, and then you have this one group of employees, you know, who's involved in a union campaign. The board is going to treat that as if it is given in the normal course. And the board articulates that very clearly in these decisions. And that's exactly why the board says you don't need to worry, employer, about giving benefits in this context, that the employer need not worry during a critical period about granting benefits as long as they can establish that it was system-wide and made for reasons unrelated to the union activity. And do they not have to justify the timing? Yes. I think that's a really good question. And the way I would answer it is that it's exactly the burden-shifting framework that the board uses. A grant of benefits creates a presumption. The employer rebuts it by saying we would have granted these benefits anyway. It was made in a corporate office. And then the burden would be on the general counsel to say, sure, but why did you do it now? Did you speed things up? You couldn't wait? Was there some reason you had to give it now? So it doesn't save the employer. That's not enough. But it certainly then puts the burden on the general counsel and the union to say, I don't believe them. You know, I don't believe that that really is the reason. But in the first instance. So just back up and walk us through this. So here they have a system-wide change. And they're thinking, do we do it, you know, two weeks before or the week after the election? And we're worried because, as you say, both of those are in jeopardy of being seen as in response to election. But then they read some cases and say, oh, actually, this is system-wide and just this little one election. So we're going to go ahead and do it, and let's do it before. And let's do it for everybody, including the collective bargaining eligible employees. And they do it. And then the board comes after them. And there's no, in that case, there's no great Dane facial distinction between election-eligible and non. And you say, oh, you did this just before the election. And they say, no, no, no, system-wide. And you say, do you have to justify the timing? Or you say, we think there's evidence of intent to interfere with union activity. Look at the timing. Is that how it goes? And then they say, no, no, no, no, timing was just convenient for us. Has that shifted the burden to them? And what can they say in response? So the board has never spelled that out in a case. So what I'm arguing is based just on the general first principles at issue in the granting and the holding of benefits. The first thing I'd say is, you know, it's a very interesting question. One I've thought about, and I can go over my answer. But the court does not have to resolve that question here because the employer didn't do that. This is facially discriminatory conduct. They withheld a benefit granted to everybody else and had no justification for it. My position would be, however, and know as Area Bagels, in all of the cases that we've cited in our brief and the union's brief where the board says, you do not need to worry about granting this benefit before the election, provided it's granted system-wide. My belief based on board law is that then once the employer establishes that, the GC would have the burden to show the timing is problematic, that you did it. You really didn't make it someone sitting in a different office without any knowledge of the union activity. We believe that you did make this decision because of the union. And the burden would shift to the GC to prove that. You know, what this court has held over and over again. Would that be the test, that if they had knowledge that there was going to be union activity, then it's impermissible? I thought it was that they were trying to influence the union activity as opposed to just that they had knowledge. Well, the cases say that an employer is to proceed as if the union were not on the scene. And what I think that is a shorthand way of saying is that certain kinds of conduct create an inference of unlawful motive. And if the record establishes that an employer changed their course of conduct because of the presence of the union, particularly in a case like this where animus is well established, and given the facts of this case that they made no efforts to not communicate to bargaining unit employees, the eligible employees, that the benefit was being withheld from them, that it creates an inference. And then the burden is on the employer to say, yes, I knew about the union, but I didn't do it for that reason. I did it because we were having trouble retaining employees in this classification, and we couldn't fill these positions, and that's why we gave a benefit during the critical period. Or because we had an insurance broker come in, and they said, you've got to fix your health insurance benefits, and that's why we did it. So it's not that the employer doesn't have knowledge of the union. It's that they didn't change their course of conduct because of the presence of the union. And the cases are very well established, and the employer can seize this point, and employers' obligation is to maintain the status quo. And the employer's argument is that that's what we did here. We didn't change anything for election-eligible employees. The ALJ in this case specifically rejects that definition of the status quo, and the employer does not cite a single case to support the notion that increasing benefits for everybody else, 20 facilities in the state of New Jersey, every single employee had their benefits increased but these, that in that case, not changing the benefits for union-eligible employees was maintaining the status quo because status quo means business as usual. What was business as usual? One health insurance plan. This company had one health insurance plan for everybody. When the benefits got worse, they got worse for everybody. These employees had an expectation that they were covered by a common health insurance plan, and then all of a sudden, two weeks before the election, they become second-class citizens with respect to that health insurance plan. They are treated differently, and that is not maintaining the status quo, and the ALJ finds exactly that in this case, that status quo is here. Is there a mechanism for the employer to get some guidance through something akin to a no-action letter before taking action? Yes. The board issues advice. Employers can write to them and get advisory opinion, but I would say, so yes, the answer is yes, but in this case, you know, the employer just needed to read board law. There is no confusion in board law for decades about this subset of cases targeted withholding. All right. Thank you. Did you have a question, Judge Wilkins? Thank you. All right. Counsel for petitioner? Thank you. Just a few points in rebuttal. For one, Your Honor, it's correct that Noah's New York Bagels is a decision that was adopted by the board, all of the findings and conclusions, so that is a decision of the board, and it's not qualified in the way that counsel has suggested. It doesn't say it depends whether it's system-wide or not. The language is an employer should not put into effect any increase not already decided upon before the union came onto the scene, so that decision couldn't be clearer in what they are suggesting. Counsel has suggested that the cases that have held that what the board tried to do with respect to differentiation have all gone the board's way. That's absolutely wrong. All of the decisions that dealt with a per se or presumptive rule in the context of differentiation, Bowling Green, Marshall Durbin, Kerwood, 800 River Road, these cases all said what the board did was impermissible, and the Great Atlantic case that union counsel refers to, when the board, when the Fifth Circuit affirmed that case, it expressly reserved the question of whether the board could have found a violation without actual evidence of motive. So it affirmed by saying there was actual evidence of improper motive here, so we're not going to reach the question of whether the board, as it says, could just presume improper motive simply because there was differentiation against employers. So do you read, I don't, I can't say I'm that familiar with the Fifth Circuit case you're referring to, but do you read some of these other circuits as saying that it's not that the board could not reach the conclusion it reached, but rather that it has to make additional findings, it has to spell out, I mean, that was sort of 800 River Road in part. It's not a but-for test. The board actually has to make some findings that you're reading these cases to say the presumption itself doesn't shift any burden of coming forward to the employer, but rather the burden is on the general counsel from the beginning. That's right, and I think in particular, I think it's the Fifth Circuit's case, but it could be the Sixth Circuit's bowling green. One of them says, and it kind of explains in detail, the real problem here is you have these unusual circumstances where you can kind of be damned if you do and damned if you don't, and in those circumstances, we think the better thing for the board to do is actually take evidence and look at everything that was going on instead of try to apply presumptions and per se rules, because this just isn't an area where you can look at something and know automatically whether the employer was trying to act in good faith versus whether they were trying to influence the election. So where you have a stipulation of facts and a waiver of a hearing, is the board entitled to draw reasonable inferences from those stipulated facts? I think, I mean, the board's always entitled to draw reasonable inferences. The problem here is I don't think there's sufficient facts from which to draw a reasonable inference, because you have to look at the stipulation against the backdrop of the law, and when the law is telling employers that they can do what the employer did here, what was done is every bit as consistent with an employer that was motivated by good faith effort to comply with the law. So in that circumstance, I think the obligation is on the board, as the Third Circuit said. I know the Third Circuit didn't say, this can't be problematic. It said, you've been told that you have a burden and you declined to try to meet it, so we're going to remand and tell you that at a bare minimum, take some evidence and figure out what motive was instead of just proceeding on a per se rule. And that's all that we're asking that the board do here is tell the board, you have to prove your case, you can't just have a per se or presumptive rule. All right, thank you. We'll take the case under advisory.
judges: Rogers, Pillard, Wilkins